United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILDEARTH GUARDIANS,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>LISA JACKSON, in her official capacity as Administrator of the Environmental Protection Agency,<br><br>　　　　Defendant. | Case No.: 11-cv-5651-YGR<br>*And consolidated action* 11-cv-5694-YGR<br><br>**ORDER GRANTING DEFENDANT'S MOTIONS TO DISMISS MANDATORY DUTY CLAIMS** |

Plaintiffs Midwest Environmental Defense, Sierra Club and WildEarth Guardians (collectively "Plaintiffs"), filed these now-consolidated actions pursuant to the citizen suit provision of the Clean Air Act, 42 U.S.C. §7604(a)(2), to compel Defendant Lisa Jackson, in her official capacity as Administrator of the Environmental Protection Agency ("EPA"), to review and, if necessary, promulgate regulations "to prevent significant deterioration of air quality which would result from the emissions of" identified pollutants, specifically photochemical oxidants, or ozone.[1] 42 U.S.C. § 7476(a). Plaintiffs argue that because the statute creates a *non-discretionary* duty to review and promulgate such regulations, injunctive relief is proper. 42 U.S.C. § 7410(k)(1)(B).

---

[1] The Clean Air Act refers to "photochemical oxidants." EPA subsequently changed the chemical designation from "photochemical oxidants" to "ozone." 70 Fed. Reg. 59582, 59590 (Oct. 12, 2005). The parties agree that references to "ozone" in the regulations and Federal Register are the equivalent of "photochemical oxidants" as stated in the statute. (*See* Dkt. 20-1 at 9, Dkt. 21 at 4, n.2.)

EPA brings this motion to dismiss the Plaintiffs' claims for failure to promulgate regulations concerning prevention of significant deterioration with respect to revised ozone air quality standards.[2] EPA moves under Rule 12(b)(1) arguing that, based upon the clear provisions of the statute itself, the duty at issue is discretionary, not mandatory. EPA argues that it previously complied with the statute when it promulgated prevention of significant deterioration ("PSD") regulations for ozone, and that the statute does not create a *mandatory* duty to update or revise the PSD rules simply because the national ambient air quality standards ("NAAQS") for ozone have been revised subsequently. As a consequence, EPA argues that there is no mandatory duty at issue and the Court is without subject matter jurisdiction under the citizen suit provisions.

Having carefully considered the papers submitted and the pleadings in this action, and for the reasons set forth more fully below, the Court finds that the language of the statute when read in the context of the language of the Clean Air Act in its entirety, does not create a non-discretionary duty to act as Plaintiffs allege. Accordingly, the motion to dismiss is **GRANTED**.

**A.  Background: The Clean Air Act**

In 1970, Congress enacted broad-sweeping amendments to the Clean Air Act, 42 U.S.C. § 7401 *et seq.*, to "guarantee the prompt attainment and maintenance of specified air quality standards." *Alaska Department of Environmental Conservation v. EPA*, 540 U.S. 461, 469 (2004) (quoting *Union Elec. Co. v. EPA*, 427 U.S. 246, 249 (1976) ("*ADEC*")). Congress enacted the amendments to facilitate the "prompt attainment" and maintenance of those air quality standards.

---

[2] The Wild Earth Complaint sets forth two claims for relief - one for failure to promulgate new regulations regarding Prevention of Significant Deterioration (PSD), and one for failure to make findings about state implementation plans (SIPs). The Midwest complaint sets forth three claims – one regarding PSD regulations and two regarding SIPs. WildEarth's Complaint has a First Claim for Relief for failure to promulgate new Prevention of Significant Deterioration ("PSD") regulations. Midwest's Second Claim for Relief in its Second Amended Complaint is also for failure to promulgate PSD regulations. The claims for relief regarding SIPs are not at issue in this motion. EPA filed an answer with respect to those claims for relief.

*Id*. It imposed numerous mandatory deadlines on the EPA and created a citizen suit provision, 42 U.S.C. § 7604(a)(2), to allow the public to enforce those deadlines.

When passed initially, the Clean Air Act enjoyed broad bipartisan congressional majorities with Republican presidents spearheading enforcement. *See* Richard N. L. Andrews, *The EPA at 40: An Historical Perspective*, 21 Duke Envtl. L. & Pol'y F. 223 (2011). Congress charged the EPA with setting national ambient air quality standards ("NAAQS") for certain specified pollutants based on criteria, and with an adequate margin of safety, to protect the public health and welfare from the adverse effects of those pollutants in ambient air. 42 U.S.C. § 7409(b). Given the focus on public health in setting the NAAQS, EPA was prohibited from conducting any cost-benefit analysis. *Whitman v. American Trucking Assocs. Inc.,* 531 U.S. 457, 467-68 (2001).

Pursuant to the statutory scheme, Congress then instructed states to create state-specific plans to ensure the attainment or maintenance of the NAAQS, now commonly referred to as SIPs or state implementation plans. *ADEC, supra*, 540 U.S. at 470. While the Clean Air Act required inclusion of certain universal components in each SIP, it afforded the states discretion to create an appropriate plan, so long as the SIPs achieved the articulated standards for clean air. *Id.* To ensure achievement of those standards, the Clean Air Act required that the EPA evaluate each state plan's sufficiency under the Act. 42 U.S.C. § 7410(k)(1)–(3).

In 1977, Congress further amended the Clean Air Act to add requirements designed to ensure not only that certain air quality standards were attained, but also that the air quality in areas which met the standards would not degrade or backslide. *ADEC, supra*, 540 U.S. at 470-71. The Clean Air Act Amendments of 1977 added provisions requiring states to establish in their SIPs specific programs to "prevent" the "significant deterioration" of air quality where pollutant levels were lower than the NAAQS. *Id.* at 470; *see also* 42 U.S.C. §§ 7470 *et seq.* (Prevention of

Significant Deterioration program).[3] These programs, commonly known as "PSD programs," are tied directly to the NAAQS. Each SIP must include "emission limitations and such other measures as may be necessary, as determined under regulations promulgated under this part, to prevent significant deterioration of air quality." 42 U.S.C. § 7471. States control emissions from facilities therein by way of permitting requirements. *ADEC, supra,* 540 U.S. at 472. "Major emitting facilities" cannot be constructed or modified unless a permit prescribing emission limitations has been issued, and ". . .a PSD permit may issue only if a source 'will not cause, or contribute to, air pollution in excess of any . . . maximum allowable increase or maximum allowable concentration [i.e., "increment"] for any pollutant'" or any NAAQS. *Id.* (quoting 42 U.S.C. §§ 7475(a)(1), 7475(a)(3)).

As to certain pollutants (sulfur oxide and particulate matter), Congress itself established the maximum allowable increases and concentrations. 42 U.S.C. § 7473 (establishing specific standards expressed in micrograms per cubic meter). As to other pollutants, including ozone, Congress charged EPA with promulgating PSD regulations that would "provide specific numerical measures against which permit applications may be evaluated, a framework for stimulating improved control technology, protection of air quality values, and fulfill the goals and purposes set forth" in the PSD program. 42 U.S.C. § 7476 (a), (c). "Though Congress contemplated that EPA might use increments for [them], it did not require their use." *Envtl. Def. Fund, Inc. v. Adm'r, U.S. E.P.A.*, 898 F.2d 183, 185 (D.C. Cir. 1990) ("*EDF*").

---

[3] The Supreme Court has explained the evolution of the PSD program this way:

> Before 1977, no CAA provision specifically addressed potential air quality deterioration in areas where pollutant levels were lower than the NAAQS. Responding to litigation initiated by an environmental group, however, EPA issued regulations in 1974 requiring that SIPs include a PSD program. Three years later, Congress adopted the current PSD program.

*ADEC, supra,* 540 U.S. at 471 (internal citations omitted).

4

In the PSD regulations promulgated under this authority, EPA set maximum allowable increases, or "increments," for some pollutants based on a mathematical relationship to each pollutant's NAAQS. *See, e.g.* 75 Fed. Reg. 64,864, 64,885 (Oct. 20, 2010) (EPA calculated the increments as a percentage of the national ambient air quality standard, consistent with the approach Congress used in the Clean Air Act itself); 50 Fed. Reg. 13,130, 13,148 (April 2, 1985) (explaining that increments to implement PSD requirements were based on "specific percentages of the lowest NAAQS concentration"); 52 Fed. Reg. 24,678, 24,685 (July 1, 1987) (explaining that increments were created by "taking a percentage of the lowest NAAQS concentration for each measurement period…"). The EPA also established *de minimis* thresholds which set specific values, in relation to each pollutant's NAAQS, below which the pollutant is not considered to cause or contribute to a violation of the NAAQS or to an established increment. These increments and *de minimus* thresholds are then used by the states to calibrate their SIP requirements. Both are appropriate. *EDF, supra*, 898 F.2d at 185 (Congress did not require setting of increments).

The parties do not disagree that EPA has previously issued PSD regulations with respect to ozone. Although EPA has apparently never set an increment for ozone, it has set a *de minimus* threshold.[4]

### B. Issue Presented and Legal Standard.

The question facing the Court is whether the language of Section 166(a) of the Clean Air Act mandates that the EPA promulgate additional regulations for ozone in light of the revised

---

[4] *See* 40 C.F.R. § 52.21 (b) (23)(i) (setting *de minimus* threshold of 40 tons per year of volatile organic compounds or nitrogen oxides with respect to ozone); 70 Fed. Reg. 71612 at 71679 (November 29, 2005) (taking final action on elements of the program to implement the 8-hour ozone standard); 54 Fed. Reg 52676, 52709, Table B (August 7, 1980) (ozone monitoring exemption value not set because there was "[n]o satisfactory monitoring technique at this time.")

5

NAAQS issued on March 27, 2008.[5] If there is no mandatory duty to promulgate additional regulations, the Court has no jurisdiction under the citizen suit provisions, and the claims must be dismissed for lack of jurisdiction.

In interpreting the statute defining the nature of EPA's duty, the Court's analysis begins "where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989); *see also In re Google Inc. Street View Electronic Communications Litig.*, 794 F. Supp. 2d 1067, 1074–75 (N.D. Cal. 2011). Where the language of the statute is plain, it is also where the inquiry should end: "the sole function of the courts is to enforce [the statute] according to its terms," assuming that an absurd interpretation does not result. *Caminetti v. United States*, 242 U.S. 470, 485 (1917); *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000).

### C. Analysis of the Statute at Issue.

#### 1. Plain Language of the Statute.

The Clean Air Act contains three primary sections.[6] As part of the section concerning the prevention of significant deterioration of air quality, Title 42 U.S.C. 7476(a), commonly referred to as Section 166(a), provides as follows:

> **(a) Hydrocarbons, carbon monoxide, photochemical oxidants, and nitrogen oxides**
> *In the case of the pollutants* hydrocarbons, carbon monoxide, *photochemical oxidants*, and nitrogen oxides, *the Administrator shall* conduct a study and not later than two years after August 7, 1977, promulgate regulations to prevent the

---

[5] *See* 36 Fed. Reg. 8186 (April 30, 1971). The NAAQS for photochemical oxides has been reviewed and/or revised four times since the initial setting. See 44 Fed. Reg. 8202 (Feb 8, 1979); 58 Fed. Reg. 13008 (Mar. 9, 1993); 62 Fed. Reg. 38856 (July 18, 1997); 73 Fed. Reg. 16436 (Mar. 27, 2008).

[6] Those three sections are: Air Quality and Emission Limitations (Title 42 U.S.C. §§ 7401-7431); Prevention of Significant Deterioration of Air Quality (Title 42 U.S.C. §§ 7470-7492); and Plan Requirement for Nonattainment Areas (Title 42 U.S.C. §§ 7501-7515).

> significant deterioration of air quality which would result from the emissions of such pollutants. [ ]
>
> *In the case of pollutants for which national ambient air quality standards are promulgated after August 7, 1977,* he shall promulgate such regulations not more than 2 years after the date of promulgation of such standards.

42 U.S.C. 7476(a) (emphasis supplied). Neither party disputes that the EPA complied with the first sentence of Section 166(a) as it relates to photochemical oxidants; that is, no party argues that EPA never issued PSD regulations after the initial promulgation of an ozone NAAQS. Instead, the question is whether the *second* sentence of Section 166(a) mandates *new and/or revised* regulations when EPA has made changes to the ozone NAAQS. More specifically, Plaintiffs alleges that: (i) on March 27, 2008, EPA issued revisions of the ozone NAAQS (73 Fed. Reg. 16,425); and (ii) as a result, EPA has a non-discretionary duty to evaluate, and if necessary, to promulgate new PSD rules relative to ozone.

EPA disagrees. It argues that pursuant to the plain language of the statute, the second sentence of Section 166(a) only applies to NAAQS for new pollutants or new pollutant indicators, not to pollutants with a previously established NAAQS. Here, EPA claims, it did not establish standards for an *additional* pollutant when it issued the revisions to the existing NAAQS for ozone. 73 Fed. Reg. at 16,436 ("Summary of Revisions to the O3 NAAQS"). Plaintiffs counter that a "revision" is just one kind of "promulgation," and therefore the EPA has continuing non-discretionary duties under the second sentence of Section 166(a) every time a NAAQS is promulgated, whether for the first time or as a revision to a previous NAAQS.

The first sentence of Section 166(a) undisputedly pertains to the "pollutants hydrocarbons, carbon monoxide, photochemical oxidants [ozone], and nitrogen oxides," and mandates action within two years of August 7, 1977. The second sentence of Section 166(a) applies to "pollutants for which national ambient air quality standards are promulgated after" August 7, 1977. In the text

7

of this particular statute, Congress did not specify whether the second sentence applied either to: (a) pollutants *other than* those specifically identified in the first sentence as a catch all provision; or (b) to *any* pollutants, including those identified in the first sentence, where revisions were made to the NAAQS *after* August 7, 1977, thereby creating a continuing duty. The statute merely provides that the duty is created with respect to "pollutants" for which the NAAQS "are promulgated" after August 7, 1977.

The definition of the word "promulgate" does not resolve the issue. "Promulgate" is defined as "to make known or public the terms of (a proposed law)" or "to put (a law) into action or force." *Webster's New Collegiate Dictionary* 943 (9th Ed. 1988). The definition does not have a temporal reference, nor does it distinguish between an original enactment of regulations and revisions made thereafter. Both an original enactment and a revision "make known" the terms of the law and "put them into force." Because the language of the statute itself can support either party's formulation, the Court does not hold it to be plain and unambiguous when read in isolation.

### 2. Language of the Statute in the Context of the Entire Act.

The Court must next determine whether construing the statute in the context of the language of the statutory scheme yields an unambiguous result. Statutory language "'cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Roberts v. Sea-Land Services, Inc.,* 132 S.Ct. 1350, 1357 (2012) (quoting *Davis v. Michigan Dept. of Treasury,* 489 U.S. 803, 809 (1989)). If the words, read in context, render the statute unambiguous, the Court need not conduct further analysis. *See, e.g., Marley v. United States,* 567 F.3d 1030, 1037 (9th Cir. 2009) ("Where Congress 'includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts

8

intentionally and purposely in the disparate inclusion or exclusion.'") (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)); *Paul Revere Ins. Group v. United States*, 500 F.3d 957, 962 (9th Cir. 2007) ("[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another.") (quoting *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1994)).[7]

The Clean Air Act, read as a whole, contains a number of instances in which Congress used the words "promulgation" and "revision" to define separate obligations and duties. First, as part of the Clean Air Act Amendments of 1970, Pub.L. 91-604, Title 42 U.S.C. § 7410(a)(1), commonly referred to as Section 110 of the Clean Air Act, Congress distinguished a promulgation from a revision in the context of triggering submission of revised SIPs. Section 110 provides that "[e]ach State shall. . . submit [its SIP] to the Administrator, within 3 years . . . after the *promulgation* of a national primary ambient air quality standard *(or any revision thereof)* under section 7409 of this title for any air pollutant...." 42 U.S.C. § 7410(a)(1) (emphasis supplied). Congress differentiated a "promulgation" from a "revision," expressly separating the two acts by use of the words "(or any revision thereof)."

Almost seven years later, as part of the 1977 Clean Air Act Amendments, Congress revised Section 109 of the Clean Air Act (42 U.S.C. § 7409), regarding the manner in which primary and secondary NAAQS were to be created. Distinguishing between "promulgation" and "revision," Congress indicated that primary and secondary ambient air quality standards "may be *revised* in the same manner as *promulgated*." 42 U.S.C. § 7409(b)(1) (relating to primary standards) and 42 U.S.C. § 7409(b)(2) (relating to secondary standards) (emphasis supplied). Congress maintained

---

[7] For instance, the Court need not look to the agency's interpretation of the statute under *Chevron* principles if the meaning is plain from context. *Cf. Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.* 467 U.S. 837, 842 (1984) (giving deference to an agency's interpretation).

that express distinction when two subsections later it provided that the Administrator "shall make such *revisions* in such criteria and *standards* and *promulgate* such *new standards* as may be appropriate in accordance with section 108...." 42 U.S.C. § 7409(d)(1).  Thus, Congress explicitly articulated the EPA's duties relative to revisions and only repeated the use of the word "promulgate" by separately characterizing the resulting "standards" as "*new* standards."

In that same round of 1977 amendments to the Clean Air Act, Congress added Section 166(a), the provision at issue here, and did not make a similar distinction.  Pub. L. 95-95, title I, § 127(a), Aug. 7, 1977, 91 Stat. 739.  That provision only specified the issuance of PSD regulations for (i) the four specific pollutants for which NAAQS had been issued previously (sentence 1) and then (ii) those for which NAAQS were *promulgated* after August 7, 1977 (sentence 2). Conspicuously absent is any mention of revisions to the NAAQS.

As a final example, later amendments to the Clean Air Act in 1990, Pub. L. 101-549, added language to Section 107 (42 U.S.C. §§ 7407).  Congress again distinguished between an original promulgation and subsequent revision.  Subsection (d)(1)(A)  provides:   "[b]y such date as the Administrator may reasonably require, but not later than 1 year after promulgation of a new *or revised* national ambient air quality standard for any pollutant under section 7409 of this title, the Governor of each State shall" submit its list of areas that do and do not meet the new or revised standard.  42 U.S.C. §§ 7407(d)(1)(A) (emphasis supplied).  Likewise, subsection (d)(1)(B) reads: "[u]pon promulgation *or revision* of a national ambient air quality standard, the Administrator shall promulgate...."  42 U.S.C. §§ 7407(d)(1)(B) (emphasis supplied).

Thus, the history of the Clean Air Act and its numerous amendments unambiguously demonstrates that Congress differentiated duties stemming from a "promulgation" versus a "revision."  Reading the Act as a whole, the Court can only conclude that Congress intended

Section 166(a) to require an initial mandatory promulgation of regulations to prevent the significant deterioration of air quality for the four pollutants identified, and thereafter, a (single, initial) mandatory promulgation for other pollutants subsequently identified. It did not include a reference to the term "revision" in the second sentence and therefore did not create a continuing, mandatory duty to act. Because Congress did not specify that Section 166(a) applied to revisions of NAAQS, as it did in numerous other provisions in the Clean Air Act, the Court does not read such an obligation into Section 166(a).

The Court is mindful that well-accepted rules of statutory construction require that it avoid "statutory interpretations which would produce absurd results...." *Ma v. Ashcroft*, 361 F.3d 553, 558 (9th Cir.2004); *see also E.E.O.C. v. Commercial Office Products Co.*, 486 U.S. 107, 120 (1988). The Court's construction here does not violate that fundamental canon of construction. Plaintiffs' argument in this regard derives principally from its overall understanding of the purposes of the Clean Air Act and its belief that in order to advance the goals set forth therein the Court must construe Section 166(a) as mandating a non-discretionary duty. Plaintiffs posit that, if not, the implementing regulations become "frozen" and may not maintain their previously chosen proportion to the national ambient air quality standards, and thus leading to an absurd result.

The Court is not persuaded. Every change to a pollutant's NAAQS does not necessarily warrant a change to the pollutant's PSD regulations. EPA continues to have discretion to modify the PSD regulations when such a change is warranted. It also has discretion as to how it formulates those PSD regulations, what percentages it might use, or whether to use percentages of the NAAQS at all. *EDF, supra*, 898 F.2d at 185. Moreover, a PSD permit applicant is always required to demonstrate that it will not cause or contribute to a violation of the most current NAAQS, regardless of whether the PSD increments and *de minimus* thresholds have been modified after that

11

NAAQS has been revised. *See* 42 U.S.C. § 7475(a)(3); 40 C.F.R. § 51.166(k)(1), 40 C.F.R. § 52.21(k)(1). The result of the Court's interpretation of Section 166(a) is that EPA is left with the authority to exercise its discretion to modify the PSD regulations, or not, in light of any revised NAAQS standard it has issued. Whatever policy reasons might make review and revision of PSD regulations a good idea when a NAAQS is revised, do not render absurd the Court's construction. Neither is it "plainly at variance" with the purpose of the Clean Air Act. Thus, based upon the authorities and arguments offered, Plaintiffs have not persuaded the Court that a patently absurd consequence would result from this construction which would then warrant further analysis beyond the words of the statute itself as read in the context of the statutory scheme for the Clean Air Act.

The Court notes that EPA has, at times, issued new PSD regulations after making changes to a previously established NAAQS.[8] Plaintiffs argue these revisions to the PSD regulation demonstrate that the agency itself has interpreted Section 166(a) as requiring it to revise PSD regulations when a NAAQS is revised. EPA counters that its past interpretation of Section 166(a) is consistent with its position here because those "revisions," such as changes to the NAAQS for particulate matter, actually established new indicators for a pollutant. The "revision" was actually a promulgation of a new standard, triggering the Section 166(a) requirements. Regardless of whether the agency has previously taken a different position, or if the position has been consistent with respect to Section 166(a), the Court does not look to the agency's interpretation at all if meaning of the statute is unambiguous. *See Chevron, U.S.A. v. Natural Resources Defense Council, Inc., supra*, 467 U.S. at 843. As stated above, the Court does not read Section 166(a) to be ambiguous, in context. Thus evidence of EPA's past actions or interpretations on the matter are irrelevant.

---

[8] *See, e.g.,* 52 Fed. Reg. 24,634 (July 1, 1987) (revising PM standard and at same time revising PSD increment); 52 Fed. Reg. 24,672, 24,683, 24,685 (July 1, 1987) (revising significant emission rate and increment); 75 Fed.Reg. 64,684, 64,880 (October 20, 2010) (revising PSD increments if revision to NAAQS to keep "current").

12

**D.     Conclusion**

Thus the Court concludes that, read in the context of the Clean Air Act and its amendments, Section 166(a) does not impose a mandatory duty to promulgate revised PSD regulations for ozone.

Defendant's Motion to Dismiss as to Wild Earth's First Claim for Relief and Midwest's Second Claim for relief on grounds of lack of jurisdiction is **GRANTED** without leave to amend. These claims are **DISMISSED**.

**IT IS SO ORDERED.**

Dated: May 7, 2012

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**